UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                              Plaintiff,

-against-                                              1:24-CV-1501 (LEK/ML)

REAL PROPERTY *commonly known as*
STATE HIGHWAY 30, AMSTERDAM,
NEW YORK 12010, *et al.*,

                              Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

 On December 10, 2024, the United States (the "Government" or "Plaintiff") commenced this action by filing a Verified Complaint against twenty-four Defendant Properties pursuant to 18 U.S.C. §§ 981 and 984, as the proceeds of offenses in violation of 18 U.S.C. §§1343, 1349, 2314, and 2315, and as property involved in offenses in violation of 18 U.S.C. §§ 1956 and 1957. Dkt. No. 1 ("Complaint").

Claimants Robert Fisher, Jacqueline Fisher, and Ryan Passino (collectively, the "Fisher Claimants") and Claimant Gladys Griffith each filed verified claims of ownership for their respective Defendant Properties. Dkt. Nos., 23, 24, 25, 26. The Fisher Claimants filed a joint motion to dismiss the Government's Complaint while Gladys Griffith filed her own motion to dismiss. Dkt. No. 29 ("Fisher Motion"), Dkt. No. 32 ("Griffith Motion"). The Government filed responses to both motions. Dkt. No. 35 ("Fisher Resp."), Dkt. No. 36 ("Griffith Resp."). Both sets of claimants filed replies. Dkt. Nos. 41, 42.

## II.    BACKGROUND

Below is a summary of the facts asserted by the Government in its Complaint and the exhibits attached it. With respect to Claimants' Rule 12(b)(6) motions, the court must accept all factual allegations in the Government's Complaint as true and must draw inferences from those allegations in the light most favorable to it. *United States v. The Baylor Univ. Med. Ctr.,* 469 F.3d 263, 267 (2d Cir.2006).

### A.  The Government's Initial Investigation

By way of introduction, the key players in the action are as follows: L.J.,[1] is the now-deceased victim who prompted the Government's forfeiture case. *See* Compl. ¶¶ 19–38, 136. Next is Gladys Griffith ("Griffith"), who was L.J.'s Power of Attorney (POA) proxy, and was responsible "pay[ing] his bills." *Id*. ¶¶19, 28, 40; 66–72; Dkt. No. 1 at 32 (ECF), Attach. A ("POA Form"). The Government alleges Griffith "defrauded, embezzled, and stole money from [L.J.] . . . after falsely representing and falsely promising that she would act as L.J.'s fiduciary and power of attorney in administering L.J.'s financial accounts for his benefit." *Id.* ¶ 19. Finally, Robert Fisher ("Fisher"), who introduced Griffith (Fisher's girlfriend at the time) to L.J., was involved in the scheme. *Id.* ¶¶ 18, 86, 92–98, 105. The Government alleges L.J.'s accounts were "fraudulently obtained" and used "to purchase real property and goods for the[] personal benefit" of Griffith and Fisher. *Id.* ¶ 21.

On July 12, 2022, a branch manager from KeyBank contacted the Fulton County Sheriff's Office ("FCSO") regarding a withdrawal exceeding $1 million dollars from L.J.'s account. *Id.* ¶ 22. The branch manager told the FCSO that "Griffith[] had withdrawn money from [L.J.'s] account" and "requested that law enforcement conduct a welfare check to make sure that

---

[1] The victim's identity is anonymized in the Complaint.

L.J. was aware of Griffith's withdrawals." *Id.* ¶¶ 22–23. The FCSO made contact with L.J., who was then living at a health care facility in Amsterdam, New York, and informed him of Griffith's alleged withdrawals. *Id*. ¶ 24. When told of the withdrawal, "[L.J.] expressed disbelief and asked the officers to contact KeyBank directly." *Id*. ¶ 25. In the presence of L.J., officers contacted KeyBank and learned that most of the withdrawals "occurred primarily between March and July of 2022." *Id*. ¶ 26. "L.J. then requested that KeyBank lock his accounts, remove Griffith's ability to access his accounts, and put a temporary hold on [them]." *Id*. ¶ 27.

L.J. spoke with Griffith by phone about the missing funds, "in the presence of FCSO officers." *Id*. ¶ 32. She said, "there was no way that much was withdraw from his accounts." *Id*. ¶ 33. Griffith later arrived at L.J.'s health care facility and, "in the presence of FCSO officers" said she "had only taken approximately $500,000 to make the house located at 246 Midline Road . . . handicap accessible." *Id*. ¶ 35. "L.J. told Griffith that she had never received his permission or approval to take the funds from his account," and that "it was not acceptable that she had taken the money from the account without telling him." *Id*. ¶¶ 36–37.

Griffith, "advised of her Miranda Rights," provided a voluntary statement to the FCSO later that day on July 12. *Id*. ¶ 39. She explained that "she resided at 4223 State Highway 30, Amsterdam, New York . . . [and] she had been L.J.'s [POA] and health care proxy for the prior four or five years." *Id*. ¶ 40. She also "worked at and ran a business" called Fisher Auto Detailing "located at 4193 State Highway 30, Amsterdam New York." *Id*. ¶ 41.

Investigators also discussed the scope of Griffith's role as POA and expenditures from L.J.'s account. *Id*. ¶¶ 42–47. Griffith told the officers that she was "responsible for paying L.J.'s bills [as POA] . . . [but] L.J. had not paid her for the aid that she provided." *Id*. ¶ 42. She went on to say that she "had full access to L.J.'s bank accounts," "that at least $550,000 was missing

from [his] accounts," and "that th[e] money went to [purchasing] 'a house on Midline Road . . .,

an extra garage, repairs, a paved driveway at the detail shop and the building next door to the

detail shop." ¶¶ 43–45. Griffith alleges "she had 'told [L.J.] about the Midline Road Property,

[and in response] he said if [she] got it for a good price that he would pay for it." *Id.* ¶ 46. She

also stated that "L.J. was unaware of the expenditures made to the property using funds from his

account, including the purchase of the garage for $26,000 and driveway paving on the property

that cost $75,000." *Id.* ¶ 47.

On July 13, 2022, FCSO investigators went to the house at 246 Midline Road and

"Griffith was present at the property" when they arrived. *Id.* ¶¶ 48–49. The investigators took

photos of the residence, noting "excavation equipment on the property, which was being used to

level and clear the backyard of the residence . . . . [as well as] multiple sports cars on the

property." *Id.* ¶ 50. Inside the home, investigators found "new sheetrock on the walls, spray foam

insulation in the roof, and a homemade ramp made from scrap wood leading from the garage . . .

. [which] did not appear to be compliant with handicap accessible regulations." *Id.* ¶ 51.

Investigators also noted that "a bathroom appeared to have been redone to be handicap

accessible, and [] that one of the doorways in the house had been widened." *Id.* ¶ 52. Later,

investigators arrived at Fisher Auto Detailing where they "observed that the property had a

freshly paved parking lot." *Id.* ¶ 53. "Griffith was present while photographs were taken of the

property, and voluntarily provided her banking account numbers to investigators at that time." *Id.*

¶ 54.

On July 14, 2022, investigators went to 4223 State Highway 30, where Robert Fisher

owns a business called "Creative Auto Body," to speak with him. *Id.* ¶¶ 55–56. Prior to the

investigators' arrival, Fisher had already learned of Griffith's alleged fraudulent transactions

when Griffith told him "I took $150,000 from [L.J.]." *Id.* ¶ 58. Fisher said he later contacted L.J. and learned the "loss was closer to $1 million." *Id.* ¶ 59. When the investigators arrived, Fisher claimed to be "in disbelief over the entire situation," believing instead that Griffith's funds came "from a large settlement from a lawsuit; and said he "could not believe Griffith was 'that stupid.' *Id.* ¶ 57. Griffith also used the money from L.J.'s account to pay the balance of Fisher's mortgage. *Id.*

**B. Terms of the POA Agreement**

Law enforcement reviewed L.J.'s POA form and learned that the victim had signed and filed the form on July 9, 2018. *Id.* ¶ 66. According to the Government, the form "designated Griffith as an agent with certain authorities," which included, *inter alia*, handling "real estate transactions," "banking transactions," "health care billing," and "retirement benefit transactions." *Id.* ¶ 67; *see also* POA Form at 2–3.

However, the POA agreement also limits the scope of the POA's authority. The form limits gift giving to $500 per year and contains "no provision . . . providing that Griffith would be compensated for services rendered on L.J. 's behalf." *Id.* ¶¶ 69–70; POA Form at 3. It also generally proscribes using "the principal's assets to benefit yourself or anyone else or make gifts to yourself or anyone else unless the principal has specifically granted you that authority in this document." *Id.* ¶ 72; *see also* POA Form at 5.

**C. Investigation of Fraudulent Transfers and Purchases from L.J.'s Accounts (December 2021 Through July 2022)**

During their investigation, law enforcement "identified several suspicious transactions" between L.J.'s brokerage account, his checking account ("L.J.'s checking account") and Griffith's checking account ("Griffith's checking account"). *Id.* ¶ 73. The Government alleges

that, beginning in December 2021, Griffith accessed L.J.'s brokerage account, and began selling shares of stock from L.J.s brokerage account, the proceeds of which were ultimately transferred to Griffith's checking account. *Id.* ¶¶ 74–79. Specifically, the Complaint explains that between December 2021 and July 2022, transfers aggregating to approximately $1.2 million occurred which originated from L.J.'s checking account and ended in Griffith's checking account. *See id.* ¶¶ 30, 74–98. During that time, the Government alleges Griffith used these funds to:

- Pay the balance of a loan on Defendant 2017 Ford F-250 (owned by Fisher), *id.* ¶¶ 86–87;

- Pay a Ford Credit Auto Loan (on behalf of Fisher) for a 2019 Ford F-550 truck, *id.* ¶¶ 89–90;

- Buy the property at 246 Midline Road, *id.* ¶¶ 92–96;

- Pay the balance of Fisher's loan on a "4WD HST Tractor W/Cab," *id.* ¶ 105;

- Purchase a new "Holland E30C Mini Excavator" (invoice made to "Bob Fisher"), *id.* ¶ 107;

- Purchase a 2021 Audi A5 (for Griffith), *id.* ¶¶ 109–10;

- Purchase a 2016 Land Rover Discovery and a 2016 Mercedes Benz CLA 250, for Fisher's daughters, *id.* ¶¶ 112–13[2];

- Pay the balance of a mortgage on 4223 State Highway 30 ("held in Fisher's name"), the property where Fisher lived, and which contains his businesses "Fisher Hot Rods & Classics" and "Creative Auto Body," *id.* ¶¶ 116–22.

---

[2] The Verified Complaint also alleges that, on August 12, 2022, one of Fisher's daughters "traded in the 2016 Mercedes-Benz CLA 250, VIN WDDSJ4GB3GN340296 in exchange for a 2018 Audi Q5, VIN WA1BNAFY6J2079610 for $32,900.00." *Id.* ¶ 114. An additional payment of approximately $12,000 was made to offset the higher cost of the 2018 Audi. *See id.*

Additionally, between December 9, 2021 and April 4, 2022, Griffith transferred approximately $150,000 from L.J.'s Fidelity investment account to her own checking account. *Id.* ¶¶ 123–27. And from April 2022 to June 2022, Griffith paid her credit card bill using more than $5,879.00 from L.J.'s checking account for charges which included, *inter alia*, "charges to the Saratoga Casino Hotel in Saratoga, New York . . . Raindancer Restaurant in Amsterdam, New York . . . and [the] Cheesecake Factory in Albany, New York." *Id.* ¶¶ 128–32.

According to the Government, none of these transactions identify L.J. as the beneficiary of these purchases or in the "transactional documents or title documents." *See, e.g.*, *id.* ¶¶ 36, 88, 91, 97, 106, 108, 111, 115, 132.

**D. Investigation of Fraudulent Transfers and Purchases from L.J.'s Accounts Upon Transfer on Death ("TOD")**

In April 2022, the Transfer on Death ("TOD") beneficiary for L.J.'s Vanguard Account "was changed to Gladys Griffith." *Id.* ¶ 134. In July 2022, a new Vanguard brokerage account was opened in L.J.'s name listing Griffith "as the full TOD beneficiary to the account." *Id.* ¶ 135. L.J. died on November 13, 2022, and in December 2022, $632,575.07 was transferred from L.J.'s Vanguard account to a recently opened Vanguard account that lists Griffith as the owner ("Griffith Vanguard Account"). *Id.* ¶¶ 136–39. Thereafter, between December 2022 and February 2023, transfers of $688,350.14 were made from Griffith's Vanguard account to an NBT Bank account identified as "Fisher Auto Detailing NBT Account 6850" ("Fisher NBT Account"). *Id.* ¶¶ 140, 147. Fisher's NBT Account lists the address of the account holder as 4223 State Highway 30, Amsterdam, New York; and prior to the transfers, the account "had a balance of $37.78 in December 2022." *See id.* ¶¶ 140–42, 146.

In February 2023, a check for $93,501.78 was drawn on an NBT account for the purchase of a 2023 Chevrolet Silverado Dump Truck. *Id.* at ¶ 143. The funds for that purchase originated from the Fisher NBT Account, which "had just received a transfer of $656,909.16 from the Griffith Vanguard Account." *Id.* at ¶ 144.

In March 2023, the Complaint alleges Fisher purchased a property in Florida (the "Loxahatchee Property") for approximately $680,000. *Id.* ¶ 149. In the same month, transfers totaling $679,928.42 left the Fisher NBT Account and were placed in escrow with a First National Bank Coastal Community. *Id.* at ¶ 148. Fisher then sold the Loxahatchee Property. *Id.* ¶ 152. On April 19, 2023, he opened an account at Berkshire Bank ("Fisher Berkshire Account"), with the address 4223 State Highway 30, Amsterdam, New York. *Id.* ¶ 150. On April 20, 2023, the Fisher Berkshire Account received $631,506.27 "corresponding to the proceeds of the sale of the Loxahatchee Property." *Id.* ¶ 153.

Between May 2023 and March 2024, the Government alleges the following transactions were among the "numerous purchases and withdrawals made with the laundered funds in the Fisher Berkshire [Account]," *id.* ¶ 155:

- *June 12, 2023, June 13, 2023 & June 16, 2023*: "(1) a Ranger Crew 1000 Premium 2023 Polaris off-road Utility Terrain Vehicle ("UTV") on June 13, 2023, for $21,171.52; (2) a 2023 Can AM Maverick Turbo X3 off-road UTV on June 13, 2023, for $24,875.92; (3) a Polaris General 1000 Sport White Lightning UTV on June 13, 2023, for $19,745.92; and (4) a RZR Trail S Premium Ghost Gray 2023 Polaris UTV, for $20,901.52." *Id.* ¶ 156.

- *July 31, 2023*: a 1937 Chevrolet Coupe was purchased for $25,000. *Id.* ¶ 159.

- *August 5, 2023*: a 2014 Caterpillar D5K2 Bulldozer for $80,000 from H&M Equipment. *Id*. ¶ 158.

- *August 7, 2023*: a 1938 Plymouth Coupe was purchased for $19,000. *Id*. ¶¶ 160–61.

- *August 8, 2023*: a 1967 Chevrolet Camaro, and 1969 Chevrolet Camaro were purchased for $50,000. *Id*. ¶¶ 162–63.

- *August 11*, *2023*: a 2003 Harley Davidson Road King for $5,000. *Id*. ¶ 164.

- *September 19, 2023*: a Chevrolet truck was purchased by Fisher for $45,000. *Id*. ¶¶ 168–69.

- *January 3, 2024*: a 1972 Chevrolet C1O was purchased for $16,500. *Id*. ¶ 170.

- *March 19, 2024*: a 1967 Chevrolet El Camino was purchased for $8,000. *Id*. ¶ 171.

In April 2024, the Daily Gazette published an article detailing Fisher's plan to open "Fisher Hot Rods & Classics" in May 2024, operating at the 4223 State Highway 30 property. *Id*. ¶ 172; Pl. Ex. B. The article explains that "Fisher has amassed an inventory of 50 cars" for sale at prices between "$10,000 [and] $70,000;" and notes that the workforce at the store includes "Gladys Griffith, Fisher's girlfriend." *Id*. ¶¶ 173–74.

## E. Summary of Defendant Properties

In sum, the Government brings its allegations against the following Defendant Properties: 1) 4223 State Highway 30, Amsterdam, New York 12010, 2) 246 Midline Road, Amsterdam, New York, 12010; 3) Funds in the amount of $268,099.70 seized from KeyBank Account Ending 6068, held in the name of Gladys Griffith; 4) Funds in the amount of $7,281.22 seized from Berkshire Bank account ending in 3312 held in the name of 'Robert Fisher d/b/a Creative Auto Sales, 5) One 2019 Ford F-550, VIN: 1FDUF5HY2KDA07255; 6) One 2023 Kubota MX6000 4wd HST Tractor, VIN: KBUL3CHCCM8F16986, with Cab and Brush Hog; 7) One

9

2023 New Holland E30C Mini Excavator, VIN: HHKHEK23E003059; 8) One 2021 Audi A5,

VIN: WAUTAAF55MA052207; 9) One 2023 Polaris Ranger Crew, VIN:

4XAT6E994P8435813; 10) One 2023 Can-Am Maverick, VIN: 3JBVGAY43PE005480; 11)

One 2023 Polaris General UTV 1000, VIN: 3NSGAE994PM393016; 12) One 2023 Polaris RZR

Trail S Premium UTV, VIN: 3NSASE999PH426359; 13) One 2018 Audi Q5, VIN: W

A1BNAFY6J2079610; 14) One 2023 Chevrolet Silverado 6500 Dump Truck,

VIN:1HTKJPVM8NH769478; 15) One 2014 Caterpillar D5K2 LGP Bulldozer, VIN:

CAT0D5K2JKYY01274; 16) One 2003 Harley Davidson Road King, Police Edition, VIN:

1HD1FHW103Y733851; 17) One 1938 Plymouth Deluxe 2 Door Coupe, VIN: 11208038; 18)

One 2017 Ford F250, VIN: 1FTBF2B67HEB48987; 19) One 1967 Chevrolet Camaro, VIN:

123677N198811; 20) One 1967 Chevrolet Camaro, VIN: 124379N546030; 21) One 1972

Chevrolet Cl0, VIN: CCE142J104629; 22) One 1967 Chevrolet El Camino, VIN:

134807K201921; 23) One 1937 Chevrolet 2 Door Coupe, VIN: 14GB0522267; and 24) One

1946 Chevrolet 3100 Truck, VIN: NCS96719.

*See* Verified Compl. at 3–6. The Government brings this action against the properties as the

proceeds of offenses in violation of 18 U.S. C. §§1343, 1349, 2314 and 2315; and as property

involved in offenses in violation of 18 U.SC. §§ 1956, 1957, and 2315. *Id*. at 6.

**F.  Claimants' Properties**

       Griffith's Motion seeks to dismiss the Government's Complaint against the following

Defendant properties: 1) 246 Midline Road, Amsterdam, New York, 12010 ("Midline

Property"); 2) the $268,099.70 seized from the Griffith Checking Account; and 3) a 2023 Polaris

General UTV 1000, VIN: 3NSGAE994PM39016 (collectively, the "Griffith Properties"). *See*

Griffith Mot. at 2–5.

The Fisher Motion seeks to dismiss the Government's Complaint against the following Defendant properties: 1) the $7,281.22 seized from the Fisher Berkshire Account; 2) Defendant 2017 Ford F250; 3) Defendant 2019 Ford F-550; 4) Defendant Real Property at 246 Midline Road; 5) Defendant 2023 Kubota MX6000; 6) Defendant 2023 New Holland E30C Mini Excavator; 7) Defendant Real Property at 4223 Highway 30; 8) Defendant 2023 Chevrolet Silverado 6500 Dump Truck; 9) 2023 Polaris Ranger Crew; 10) 2023 Can-Am Maverick; 11) 2014 Caterpillar D5K2 LGP Bulldozer; 12) 2003 Harley Davidson Road King, Police Edition; 13) 1938 Plymouth Deluxe 2 Door Coupe; 14) 1967 Chevrolet Camaro; 15) 1967 Chevrolet Camaro; 16) 1972 Chevrolet Cl0; 17) 1967 Chevrolet El Camino; 18) 1937 Chevrolet 2 Door Coupe; 19) 1946 Chevrolet 3100 (collectively, the "Fisher Properties"). *See* Fisher Mot. at 6–7; Compl. at 5.

## III.    LEGAL STANDARD

"Motions to dismiss *in rem* forfeiture actions are governed by Federal Rule of Civil Procedure 12(b) and Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions." *In re 650 Fifth Ave. & Related Properties,* 777 F.Supp.2d 529, 541 (S.D.N.Y.2011); *see also* Fed. R. Civ. P. 12(b); Supp. R. G(8)(b)(i) for Admiralty or Maritime Cl. And Asset Forfeiture Actions (the "Supplemental Rules"). On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *United States v. Any & all Funds on Deposit in Account No. 0139874788, at Regions Bank, held in the name of Efans Trading Corp.,* No. 13-CV-7983, 2015 WL 247391, at *5 (S.D.N.Y.2015) (internal citation omitted). The Government's

Complaint will survive if it alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)

Further, in forfeiture actions *in rem*, the Supplemental Rules, require that a complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f). The Government's Complaint must "assert specific facts supporting an inference that the property is subject to forfeiture." *United States v. $22,173.00 in U.S. Currency,* 716 F. Supp. 2d 245, 248 (S.D.N.Y.2010) (citation omitted). However, at this early stage, "[t]he issue is one of pleading, not proof, and '[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property.'" *United States v. $32,507.00 in U.S. Currency,* No. 14-CV-5118, 2014 WL 4626005, at *1–2 (S.D.N.Y. Sept. 16, 2014) (quoting 18 U.S.C. § 983(a)(3)(D)).

"[T]he burden of proof [] rests solely with the government to show by a preponderance of the evidence . . . that the property is subject to forfeiture." *United States v. Sum of $185,336.07 U.S. Currency Seized from Citizen's Bank Acct. L7N01967*, 731 F.3d 189, 196 (2d Cir. 2013). The Government must do this by "establishing a 'substantial connection' between the Defendant-Funds [or Properties] and the predicate criminal offense." *See United States v. $603,650.28 Seized From Bank of Am. Acct. Ending in XXXX Held in Name of Zhaohui Chen,* No. 13-CV-1098, 2024 WL 4007346, at *6 (N.D.N.Y. Aug. 30, 2024) (citing 18 U.S.C. § 983(c)(1), (3)). Moreover, at this early stage, the government may satisfy that burden through circumstantial evidence. *See United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) ("[T]he government is entitled to prove its case solely through circumstantial evidence.").

With the above pleading standards in mind, the court turns to Claimants' arguments on their motions.

## IV.    DISCUSSION

Given that Griffith and the Fisher Claimants have each filed separate motions to dismiss, the Court will handle each motion below.

### A.  Griffith Motion

Griffith moves to dismiss the Government's claims under three bases. First, she argues that the Complaint fails to state a claim for forfeiture under 18 U.S.C. § 981 because it neither alleges that Griffith "knowingly engaged" in "criminal conduct," nor that "the Griffith Properties are proceeds of or involved in any specified unlawful activity." *See* Griffith Mot. at 8–13. Second, that the Complaint fails because it "not verified by a person with personal knowledge of the facts, but by a special agent" with secondhand knowledge. *See id*. at 14. And finally, that the Government's claim as to Griffith's Checking Account is untimely because the transactions which serve as the basis for the claim "fall[] outside of the one-year statute of limitations prescribed by 18 U.S.C. § 984(b)." *Id*. at 15.

*1.  The Government states a claim pursuant to 18 U.S.C. § 981.*

The Government alleges that the Griffith Properties are subject to forfeiture because they are connected to an investigation into Griffith and Fisher for, among other things, wire fraud. Compl. ¶¶ 18–21. Under 18 U.S.C. § 981, "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956 [or] 1957 . . . of this title, or any property traceable to such property" is subject to forfeiture to the United States. 18 U.S.C. § 981(a)(1)(A). Further, under 18 U.S.C. § 984,

> In any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution ...

13

> (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for the forfeiture; and
> (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property.

18 U.S.C. § 984(a)(1)(A)–(B). And "any identical property found in the same place or account as the property involved in the offense that is the basis for the forfeiture shall be subject to forfeiture under this section." *Id.* § 984(a)(2). Importantly, "criminal conviction of a claimant either in state or federal court is neither a necessary nor sufficient precondition to an *in rem* forfeiture." *von Hofe v. United States*, 492 F.3d 175, 190 (2d Cir. 2007).

Section 1956 specifically contemplates actions violating the wire fraud statute as specific unlawful activity subjecting property to forfeiture. 18 U.S.C. § 1956(c)(7)(A). "The essential elements of mail and wire fraud are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Runner*, 143 F.4th 146, 154 (2d Cir. 2025) (citation omitted); *see* 18 U.S.C. § 1343. The statute does not define "scheme to defraud," but courts have described it as a plan to deprive a person "of something of value by trick, deceit, chicane or overreaching" and a "departure from community standards of 'fair play and candid dealings.'" *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000) (citations omitted). "To prove a scheme to defraud, the government must prove that the defendant made misrepresentations that were 'material,' and 'that the defendant acted with fraudulent intent.'" *Runner*, 143 F.4th at 154 (quoting *U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016)). Further, fraudulent intent requires "intent to deceive and intent to cause actual harm." *Id.* (citing *United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir. 1992)).

The core of the Government's allegations against Griffith are that she exceeded the scope of her POA responsibilities by fraudulently "divert[ing] more than $2 million in L.J.'s funds to accounts controlled by herself and Fisher." Compl. ¶¶ 18–20. Pointing to the POA agreement, the Government avers that it required Griffith to, *inter alia*, "avoid conflicts that would impair your ability to act in the principal's best interest," "keep the principal's property separate and distinct from any assets you own or control," and that Griffith "may not use the [L.J.'s] assets to benefit yourself or anyone else or make gifts to yourself or anyone else unless the principal has specifically granted you that authority." *Id.* ¶ 71; POA Form at 3.

However, the Government alleges that, beginning in December 2021, Griffith made "changes to L.J.'s accounts online that allowed her the ability to divert his money to her account" and that her "scheme to defraud L.J. continued to unfold" over the next year. *See* Griffith Resp. at 14–15; *see also* Compl. ¶¶ 73–139. Between December 2021 and June 2022, the Complaint alleges Griffith fraudulently transferred more than $1.2 million from L.J.s accounts to her own and Fisher's to buy homes, Compl. ¶¶ 30, 92–96, 116–22, cars, *id.* ¶¶ 105–13, and at least one meal at the Cheesecake Factory, *id.* ¶¶ 128–32. Then, after assigning herself as the TOD beneficiary to L.J.'s Vanguard Account, she received $632,575.07 upon his death, which she then used to finance the purchases of additional real property and vehicles in coordination with Fisher. *Id.* ¶¶ 133–74. The Government alleges that none of the changes or transfers Griffith made were done with L.J.'s permission or for his benefit. *See*, *e.g.*, *id.* ¶¶ 36, 88, 91, 97, 106, 108, 111, 115, 132. And that after L.J. initially learned of Griffith's alleged fraudulent activities, he "requested that KeyBank lock his accounts, remove Griffith's ability to access his accounts, and put a temporary hold on [them]." *Id.* ¶ 27.

15

In turn, Griffith avers that the Government has failed to meet its pleading burden with respect to the Griffith Properties "because it does not allege any facts that show that the Griffith Properties are proceeds of or involved in any specified unlawful activity, or that Griffith knowingly engaged in any wire fraud, money laundering, or other criminal conduct." *See* Griffith Mot. at 8–13. The Court disagrees.

### a.   The 246 Midline Property

First, Griffith avers that the Complaint's allegations about withdrawals from L.J.'s Vanguard Account funding the purchase of the 246 Midline Road Property are "meaningless without more than the mere suggestion that they were nefarious or unknown to L.J." Griffith Mot. at 11. But, in this Court's view, this is not simply a matter of speculation.

According to the Complaint, the 246 Midline Road Property "show[s] that Fisher and Griffith purchased the Midline Road Property" and "L.J. is not listed on any of the transactional documents or title documents associated with the purchase of the Midline Road Property." Compl. ¶¶ 92, 97. The property was purchased for $150,000 allegedly using money that was transferred from L.J.'s Vanguard Account to Griffith's Checking Account. *Id.* ¶¶ 92–98. In her Motion, Griffith avers that the Complaint "accurately reflects that [L.J.] knew she was purchasing the home," because she "told him about the property, [and] he said if [she] got it for a good price that he would pay for it." Griffith Mot. at 11 n.6; Compl. ¶ 46.

However, when Griffith told L.J. about the purchase (two months later, and after the Complaint alleges L.J. had learned of it) he "told Griffith that she had never received his permission or approval to take the funds from his account," and that "it was not acceptable that she had taken the money from the account without telling him." *Id.* ¶¶ 36–38. In fact, the Complaint alleges she only had permission to "pay [L.J.'s] bills." *Id.* ¶¶ 28, 42. Griffith later told

investigators that while she purchased the home that "L.J. was unaware of the expenditures made to the property using funds from his account, including the purchase of the garage for $26,000" and, separately, "a paved driveway at [Fisher's] detail shop." *Id.* ¶¶ 44, 47.

Accepting the Government's allegations as true, Griffith did not have L.J.'s permission to remove funds from his account, and by removing those funds, exceeded the scope of her authority under the POA agreement. *See* POA Form at 4 (explaining Griffith must, among other things, avoid conflicts of interest and "keep the principal's property separate and distinct from any assets you own or control."). Thus, the Court is satisfied that the Government has plausibly alleged the funds used to purchase the Midline property were used outside the scope of the POA agreement and subject to forfeiture under Section 981.

### b. $268,099.70 seized from Griffith's Checking Account

Next, Griffith argues that the claim against the $268,099.70 seized from her checking account fails. Griffith Mot. at 11–12. She avers that while the Complaint alleges a series of transactions originating from L.J.'s accounts and ending in hers, it is "without assertion as to who made them, where they were made, or any other allegation that would suggest they were related to fraud." *Id.* at 12.

Plaintiff alleges the opposite. For example, the Complaint alleges that, on December 8, 2021 and May 31, 2022, someone logged into L.J.'s Vanguard Account from an IP address registered under Griffith (67.240.1.109) and began transferring money from the Vanguard Account into Griffith's Checking Account. Compl. ¶¶ 74–122. In December, "an order was placed for the sale of 735 shares of stock of National Grid PLC for a price of $50,531.99" from L.J.'s Vanguard Account and the proceeds were transferred to his Checking Account. *Id.* ¶¶ 75,

77. $8,000 was transferred to Griffith's Checking Account from L.J.'s Checking Account. *Id.* ¶¶ 78–79.

From April through July 2022, "a number of sizeable transfers were made from L.J.['s Accounts] into [Griffith's Checking Account]" totaling roughly $1.2 million. *See id.* ¶¶ 80–122. The Government alleges that, in addition to the Midline property, these funds were used, inter alia, to satisfy a $12,668 loan on Defendant 2017 Ford F-250, buy Defendant 2019 Ford F-550, worth $42,546.87, and satisfy a mortgage held in Fisher's name for [Defendant] property located at 4223 State Highway 30, Amsterdam, New York 12010." *Id.*

Importantly, the Government alleges "that between March 7, 2021 and September 1, 2023, the IP address 67.240.1.109 was registered to subscriber Gladys Griffith." *Id.* ¶ 76.

Contrary to Griffith's contention, the Government's allegations appear clear: Griffith made the transactions. She made them by using L.J.'s accounts to transfer funds to her own checking account. And at least $500,000 of the over $1.2 million taken from his accounts went to "a house on Midline Road in Broadalbin, an extra garage, repairs, a paved driveway at [Fisher's] detail shop and the building next door to the detail shop" and was used by Griffith "without [L.J.'s] permission or approval." *See id.* ¶¶ 36, 44.

Thus, the Court is satisfied that the Government has plausibly alleged the funds seized from Griffith's Checking Account were transferred to her outside the scope of the POA, used unlawfully, and are subject to forfeiture under Section 981. *See United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (explaining that "direct proof of [Claimant's] fraudulent intent is not necessary . . . . [i]ntent may be proven through circumstantial evidence.").

c.  Polaris General UTV 1000, VIN: 3NSGAE994PM39016

Lastly, Griffith argues the Government cannot state a claim against Defendant Property Polaris General UTV 1000, VIN: 3NSGAE994PM39016 ("Polaris"). Mot. at 12–13. Griffith's argument rests on the Government's assertion that the purchase of the Polaris vehicle is allegedly linked to funds disbursed from L.J.'s Vanguard Account upon his death. *Id.* She avers "the Government has not alleged that these TOD transfers were done without L.J.'s instruction or wishes." *Id.* at 13.

The Complaint alleges that on April 21, 2022 and July 1, 2022, Griffith either modified existing accounts or created new accounts in L. J's name and named herself as the TOD beneficiary on said accounts. Compl. ¶¶ 133–35. Upon his death in November 2022, approximately $632,575.07 was transferred to Griffith's Vanguard Account in December 2022. *Id.* ¶¶ 136–39. Thereafter, Griffith transferred approximately $688,200.17 to Fisher's NBT Account, which Fisher then used to buy real property and various vehicles, including the Polaris UTV on June 13, 2023. *Id.* ¶¶ 140–56.

The Court finds that the Government's allegations are sufficient to withstand Griffith's Motion at this stage. Here, the TOD transfers are linked to the Government's overall theory of "Griffith's scheme to defraud L.J." Griffith Resp. at 15; Compl. ¶ 19. While Griffith avers that the Government cannot show that the TOD disbursement she received "were the proceeds of or involved in any specified unlawful activity," Griffith Mot. at 13, that assessment is belied by the fact that, in July 2022 (three months after the initial changes), "L.J. told Griffith that she had never received his permission or approval to take [] funds from his account," and that "it was not acceptable that she had taken the money from the account without telling him." Compl. ¶¶ 36–

19

37. Thus, the TOD proceeds, and the Defendant Property purchased with those proceeds, are linked to the scheme to defraud L.J..

At this stage, the Court is satisfied that the Complaint plausibly alleges the Polaris vehicle was purchased with funds traceable to Griffith's fraudulent scheme and is subject to forfeiture under Section 981.

       2.  *Special Agent Timothy W. Irving sufficiently verifies the Complaint.*

Griffith further argues that the Complaint fails to satisfy the requirements of Supplemental Rule G because it has only been verified "by [Special Agent Timothy Irving] who merely states that the facts are based on information received from other law enforcement officers." Griffith Mot. at 14–15.

The Supplemental Rules require that a civil forfeiture complaint "be verified." Supp. R. G(2)(a). The term "verified" is governed by 28 U.S.C. § 1746. In relevant part, in states:

> [w]herever, under any law of the United States . . . , any matter is required or permitted to be . . . proved by the sworn verification, . . . in writing of the person making the same), . . . such matter may, with like force and effect, be . . . proved by the unsworn . . . verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form: . . .
> (2) If executed within the United States . . . : "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)."

28 U.S.C. § 1746. Courts have held that verification under Section 1746 is proper where there is: "(i) an assertion that the facts are true and correct; and (ii) an averment that the first assertion is made under penalty of perjury." *United States v. 8 Gilcrease Lane, Quincy Fla. 32351*, 587 F. Supp. 2d 133, 139 (D.D.C. 2008) (citing *Nissho–Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir.1988)). "A writing that does not contain the exact language of 28 U.S.C. § 1746 will not be disregarded provided it substantially complies with these statutory requirements, which is all

that this Section [1746] requires." *Tackman v. Goord*, No. 99-CV-438, 2005 WL 2347111, at

*27 (W.D.N.Y. Sept. 26, 2005) (cleaned up). Moreover, Section 1746 is understood to allow

verifications pled "on information and belief—not only admissible evidence." *United States v.

Prevezon Holdings LTD*., 122 F. Supp. 3d 57, 75 (S.D.N.Y. 2015) (internal quotation marks

omitted). To satisfy that requirement, the Government's affidavit need only states its

"'reasonable belief' that [it] would be able to meet its burden of proof at trial.'" *Id*.

Furthermore, the analysis required to determine whether a complaint is verified is usually

minimal. Indeed, courts in this Circuit have characterized the verification requirement as a mere

formality. *See United States v. Approximately Five Hundred Forty-One Thousand Nine Hundred

Fifty-Three Dollars & Zero Cents Seized from JP Morgan Chase NA Acct. No. XXXXXXXX

Held in Name of Jiawig Trade Inc.,* No. 23-CV-9585, 2025 WL 1029431, at *3 (E.D.N.Y. Feb.

10, 2025), *report and recommendation adopted*, No. 23-CV-9585, 2025 WL 923412 (E.D.N.Y.

Mar. 27, 2025) (citing *United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l

Trading Ltd.*, 324 F. Supp. 3d 38, 48 (D.D.C. 2018)). In numerous cases in this Circuit, courts

have taken a cursory approach: simply looking to see if the complaint was verified. *See, e.g.*,

*United States v. Assorted Jewelry VL: $39,100.00*, No. 23-CV-1435, 2024 WL 3827668, at *5

(N.D.N.Y. Aug. 15, 2024); *United States v. 70,932.00 United States Currency*, No. 16-CV-245,

2019 WL 2610708, at *2 (W.D.N.Y. June 25, 2019); *United States v. $7,300 in U.S. Currency*,

No. 02-CV-3633, 2003 WL 21496858, at *1 n.2 (S.D.N.Y. June 27, 2003).

Griffith's argument is that, given the "absence of any sworn statements, documentary

evidence, or direct witnesses," Special Agent Irving's verification "is insufficient to establish the

veracity and reliability of the allegations" in the Complaint. Griffith Mot. at 14. And further, that

the Complaint "does not state sufficiently detailed facts to support a reasonable belief that the

Government will be able to meet its burden of proof at trial." *Id.*

  Griffith's sufficiency argument fails for two reasons. First, the Complaint in the instant

action is sufficiently verified.[3] Special Agent Irving's verification statement is "duly sworn,"[4]

"assert[s] that the facts contained [in the Complaint] are true to the best of [his] knowledge and

belief," and substantially conforms with the requirements of Section 1746. *Compare* Dkt. No. 1

at 31 ("Affidavit") *with* 28 U.S.C. § 1746. Contrary to Griffith's contention, personal knowledge

of the events at issue is not required. Instead, at this initial stage, the Government may plead its

case "on information and belief" and state a "'reasonable belief' that [it] would be able to meet

its burden of proof at trial.'" *Prevezon Holdings LTD.*, 122 F. Supp. 3d at 75. Therefore, the

Court finds that the Complaint satisfies Supp. R. G(2)(a)'s verification requirement. *Id.* at 75–76.

  Second, the Complaint provides sufficient "documentary evidence" tracing the Defendant

Griffith Properties to the Government's allegations of unlawful activity, satisfying Supp. R.

G(2)(f). However, "the Government is not required to have *sufficient* evidence at the time it files

its complaint to establish forfeitability." *United States v. Real Prop. Known as Unit 5B of Onyx*

*Chelsea Condo.*, No. 10-CV-5390, 2012 WL 1883371, at *6 (S.D.N.Y. May 21, 2012) (emphasis

---

[3] And, for the sake of formalities, the Court affirms that the Complaint meets the requirements of
Supp. R. G(2)((b)—(e) as well.

[4] The Complaint was "sworn to and subscribed" in the presence of notary public. Compl. at 31.
"A declaration sworn before a notary public, however, need not comply with the § 1746 penalty
of perjury requirements." *New Falls Corporaton v. Soni Holdings, LLC*, No. 219-CV-449, 2021
WL 855939, at *6 (E.D.N.Y. Mar. 5, 2021), *aff'd sub nom. New Falls Corp. v. Soni Holdings,*
*LLC*, No. 21-865-CV, 2022 WL 2720517 (2d Cir. July 14, 2022); *see also Lamoureux v.*
*Anazaohealth Corp.*, No. 03-CV-1382, 2010 WL 4875870, at *2 (D. Conn. Nov. 18, 2010) ("To
be admissible . . . an affidavit must be sworn to before an officer authorized to administer oaths,
such as a notary public. Alternatively, under 28 U.S.C. § 1746, an unsworn declaration, which is
dated and signed by the defendant under penalty of perjury and verified as true and correct may
be used in lieu of a sworn affidavit.") (internal citation and quotation marks omitted).

added). Instead, the Government's burden at this stage is to provide the Court with "a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f).

As laid out *supra* Part IV(A)(1), the Government's central allegation is that Griffith and Fisher engaged in a scheme to defraud L.J. by exceeding the scope of her POA agreement. The Government alleges that between December 2021 and July 2022, Griffith transferred over $1.2 million from L.J.'s accounts to her own and made herself the TOD beneficiary of L. J.'s Vanguard Account as part of this scheme. *Id*. ¶¶ 19, 73–135. According to the Complaint, L.J. was unaware of these changes and transactions, and Griffith did not have his permission to make them. *See id*. ¶¶ 36–37. Taken together, along with the fact that these allegations suggest Griffith violated the express terms of the POA agreement, *id*. ¶¶ 71–72; *see also* POA Form, and provide the Court with "a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f).[5]

> ### 3. *The Government's claims over the funds in the Griffith Checking Account are timely.*

Finally, Griffith avers that by bringing their forfeiture claim within the one-year statute of limitations governed by Section 984(b), the Government was barred from seizing the $268,099.70 from her checking account. Griffith Mot. at 15. In Opposition, the Government argues that this interpretation of the statute "erroneously imposes the one-year timeline associated with 18 U.S.C. § 984(b) upon the forfeiture of property subject to forfeiture pursuant

---

[5] In Griffith's Motion, she argues that the Government cannot "rely on a witness who cannot provide the non-hearsay testimony about them at a forfeiture hearing because he's deceased." Griffith Mot. at 14. Griffith is reminded that "the property owner in a civil forfeiture action—not the government—generally has the burden of proof, and hearsay is admissible to prove the 'guilt' of the property." *United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 903 (2d Cir. 1992).

to 18 U.S.C. § 981(a)(l)(A) and (C)," and instead suggests that 19 U.S.C. § 1621 is the appropriate statute of limitations. Griffith Resp. at 20–21.

While the Government referenced Section 984(b) in its Complaint, that statute does not supply the limitations period here. Section 984 provides that "[n]o action pursuant to this section to forfeit property *not traceable* directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense." 18 U.S.C. § 984(b) (emphasis added). Section 984(b)'s one-year rule applies only where the Government seeks to use that subsection as a substitute for tracing specific tainted funds. *United States v. Contents in Acct. No. 059-644190-69*, 253 F. Supp. 2d 789, 793 (D. Vt. 2003) ("Section 984 gave the government a broad, new power to seize fungible property without regard to its traceability . . . , but simultaneously imposed a one-year . . . limitations period.").

But here, the Government has traced the tainted funds directly the underlying offense in accordance with Section 981, thus rendering Section 984(b) inapplicable. *See supra* Part IV(A)(1). In fact, "[t]he [C]omplaint provides numerous paragraphs of detail showing when funds were transferred into [Griffith's] account and when they were transferred out." *In re 650 Fifth Ave.*, 777 F. Supp. 2d at 572. As such, the appropriate limitations period is governed by 19 U.S.C. § 1621, which provides that "within five years after the time when the alleged offense was discovered, or in the case of forfeiture, within 2 years after the time when the involvement of the property in the alleged offense was discovered, whichever was later." 19 U.S.C. § 1621; *In re 650 Fifth Ave. & Related Props*., 830 F.3d 66, 96 (2d Cir. 2016); *Contents in Acct. No. 059-644190-69*, 253 F. Supp. 2d at 794 (explaining that the five-year statute of limitations is available to the Government when it seeks forfeiture under Section 981 assuming it "demonstrate[s] the property it has seized is traceable to conduct proscribed by 18 U.S.C. §§

1956 or 1957."). Thus, given that the instant action commenced in December 2024, and "the first acts underlying forfeiture are identified as occurring no earlier than December 2021" the Government is well within the limitations period. Griffith Resp. at 21.

Having dispensed with Griffith's arguments, the Court is satisfied the Government has met its burden under Rule 12(b)(6) and Supp. R. G. Accordingly, Griffith's Motion is denied.

### B. Fisher Motion

The Fisher Claimants move to dismiss on two grounds. First, they aver that the Complaint provides the foundations of an affirmative defense which "align[s] with Claimants' innocent owner defenses." *See* Fisher Mot. at 4–6. Alternatively, they argue that the Complaint regarding the Fisher Properties is conclusory. Fisher Mot. at 6–8.

For the reasons that follow, the Fisher Motion is denied.

### 1. Neither party has raised "innocent owner" defense.

In their Motion, the Fisher Claimants argue that by introducing facts which suggest Fisher was not involved in Griffith's alleged fraudulent scheme, the Government has established an affirmative defense for innocent ownership and thus "there is no case or controversy" for the court to review. *See* Fisher Mot. at 4–6.

The so-called "innocent owner" defense provides that "[a]n innocent owner's property shall not be forfeited under any civil forfeiture statute." 18 U.S.C. § 983(d)(1). Whether one can assert the defense depends on if the "claimant's property interest was acquired before or after the illegal conduct giving rise to the forfeiture took place." *United States v. $822,694.81 in United States Currency, Seized from Acct. No. XXXXXXXXXXX, Held in Names of Godwin Ezeemo & Winifred C.N. Ezeemo, at Bank of Am.,* No. 13-CV-545, 2019 WL 4369936, at *4 (D. Conn. Sept. 12, 2019) (quoting *United States v. Real Prop. Located at 6124 Mary Lane Drive, San*

*Diego, California*, No. 03-CV-580, 2008 WL 3925074, at *2 (W.D.N.C. Aug. 20, 2008)). If the interest arose before the unlawful activity, then an "innocent owner" is one who was unaware of the "conduct giving rise to forfeiture; or . . . upon learning of [said] conduct . . . did all that reasonably could be expected" to cease use of the property. 18 U.S.C. § 983(d)(2)(A). If the interest arose after, then an innocent owner must be one who is a "bona fide purchaser" who neither knew or had reason to know that "the property was subject to forfeiture." 18 U.S.C. § 983(d)(3)(A).

Courts may consider such a defense "raised by a pre-answer motion to dismiss under Rule 12(b) (6), without resort[ing] to summary judgment procedure, if the defense appears on the face of the complaint." *United States v. One Tyrannosaurus Bataar Skeleton*, No. 12-CV-4760, 2012 WL 5834899, at *4 (S.D.N.Y. Nov. 14, 2012) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir.1998)). However, the burden of proving the defense is the Claimants', "by a preponderance of the evidence." 18 U.S.C. § 983(d)(1).

Here, it is not clear that such defense appears on the face of Complaint. The Fisher Claimants point to the allegations at Compl. ¶¶ 57–59 and aver they support the proposition that Fisher was neither engaged in a conspiracy with Griffith nor do they "reference R. Fisher engaging in criminal activity." Fisher Mot. at 4–5 (cleaned up). The first issue with this is procedural: the paragraphs the Fisher Claimants cite to do not state when or how their property interest in the Fisher Properties arose based on Fisher's statements to law enforcement as required for the Court to even begin assessing the defense. Compl. ¶¶ 57–59; *see* also 18 U.S.C. §§ 983(d)(2), (3). Without this, the Court will not begin the analysis into Claimants alleged defense – it is the Claimants' burden to prove. 18 U.S.C. § 983(d)(1).

The second issue is substantive, as a showing has not been made "by a preponderance of the evidence." *Id.* While the facts alleged might support the Fisher Claimants' assertion that Fisher had no knowledge of Griffith's unlawful activity in isolation, the court is "required to accept *all* 'well-pleaded factual allegations' in the complaint as true." *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020) (citations omitted) (emphasis added). And at a cursory glance, nothing in the Complaint seems to support the notion that he ceased use of the Defendant Fisher Properties once he learned of Griffith's conduct, as required under 18 U.S.C. § 983(d)(2)(A), nor that he a was bona-fide purchaser, as required under 18 U.S.C. § 983(d)(3)(A). *See generally* Compl.

Given that this defense does not appear on the face of the Complaint, and Claimants do not appear to have properly raised it, the Court finds the Fisher Claimants argument here lacks merit.[6]

> ### 2.   *The allegations against the Fisher Defendant Properties satisfy Supplemental Rule G(2)(f).*

The Fisher Claimants further argue that the Complaint fails to state a claim as to the Fisher Properties because its allegations are "conclusory." Fisher Mot. at 6–8. In general, Claimants argue that the Government has not shown that Fisher engaged in any unlawful activity and that there is not a way to trace any of Griffith's alleged wrongdoing to him. *Id.*

---

[6] For the sake of clarity, the Court is not ruling on the merits of the Fisher Claimants' "innocent owner" defense, because it doesn't appear on the face of the Complaint. If after the disposition of this Memorandum-Decision & Order the Claimants properly raise that defense, the Court will entertain it at the appropriate time.

In Opposition, the Government avers that the Complaint establishes that the Fisher Properties are subject to the same forfeiture as the Griffith Properties under, *inter alia*, the wire fraud statute. *See* Fisher Resp. at 13–17.[7]

At the outset, the Court will note that the Fisher Claimants' contention that he neither knew about Griffith's alleged unlawful activity, nor was connected to it represents a fundamental misunderstanding of the nature of the current action. Civil *in rem* forfeiture proceedings rest on two principles: 1) the action "proceeds against the property itself under the legal fiction that the thing is primarily the offender"; and 2) "neither conviction nor even the commencement of criminal proceedings is a necessary precondition to an *in rem* forfeiture." *von Hofe*, 492 F.3d at 184–85 (cleaned up). Ultimately, the "claimant's culpability in the underlying criminal conduct is irrelevant." *$822,694.81 in United States Currency,* 2019 WL 4369936, at *4 (D. Conn. Sept. 12, 2019) (collecting cases).

a.    Defendant funds in the amount of $7,281.22

The Complaint alleges that after L.J. died, Griffith transferred approximately $688,200.14 Fisher's NBT Account between December 23, 2022 and February 7, 2023. Compl. ¶¶ 136–42.[8] In March 2023, "two outgoing wire transfers totaling $679,928.42" left Fisher's NBT Account and the Complaint alleges Fisher bought the Loxahatchee Property, worth approximately $680,000, with those funds. *Id*. ¶¶ 148–49. In April, the Government further

---

[7] Given the robust discussion *supra* Part IV(A)(1) regarding the Government's forfeiture case against the Griffith Properties, and how the Government's theory of the Defendant Properties' liability arising out of Griffith's and Fisher's alleged unlawful activity is largely consistent across the Complaint, the Court will not reanalyze the elements of Title 18 Sections 981, 984, or 1343 here.

[8] The Government alleges that, before these transfers, the NBT Account "had a balance of $37.78 in December 2022." *See* Compl. ¶¶ 146–47.

alleges Fisher created his Berkshire Account, subsequently sold the Loxahatchee, and that the Berkshire Account received "an incoming wire of $631,506.27 from 'Mellinger Title Services LLC' corresponding to the proceeds of the sale of the [] Property." *Id.* ¶¶ 150–153.

At this stage and given the Complaint's allegations involving the fraudulent scheme discussed *supra* Part IV(A)(1), the Court is satisfied that the claim against the funds seized from Fisher's Berkshire Account satisfy the requirements of Supp. R. G(2)(f).

        b.   Defendant 2017 Ford F-250; Defendant 2019 Ford F-550; Defendant Real Property 246 Midline Road; Defendant 2023 Kubota MX6000; Defendant 2023 New Holland E30C Mini Excavator; Defendant Real Property at 4223 State Highway 30; Defendant 2023 Chevrolet Silverado 6500 Dump Truck

The Fisher Claimants argue that the allegation against the Defendant Properties listed in the title of this subsection "are all bare and again only address Griffith's alleged actions." Fisher Mot. at 6–7. With the exception of Defendant 2023 Chevrolet Silverado 6500 Dump Truck, the remaining properties appear linked to the Government's allegation that between December 2021 and July 2022, Griffith transferred $1.2 million from L.J.'s Accounts to her own, and exceeded the scope of her POA agreement by, among other things, satisfying the financial obligations on the Defendant Real Properties 246 Midline Road and 4223 State Highway, or the loans on various other vehicles owned by Fisher, including Defendant 2023 Kubota MX6000 Tractor, Defendant Holland E30C Mini Excavator, Defendant Ford F-550 and Defendant F-250. *See* Compl. ¶¶ 86–122. As for the 2023 Chevrolet Silverado 6500 Dump Truck, the Complaint alleges that in February 2023, a check for $93,501.78 was drawn on Fisher's NBT Account which had just received $656,909.16 from Griffith's Vanguard Account. *See id.* ¶¶ 143–44.

Given that the funds used to purchase these Defendant Properties are sufficiently tied to the Government's overall theory that Griffith engaged in fraud by exceeding the scope of her POA agreement by, inter alia, assigning herself the TOD beneficiary of L.J.'s Vanguard and Brokerage Accounts, receiving those funds without L.J.'s permission, and used them to benefit herself and Fisher, the Court finds that the Government has met its burden and that these Defendant Properties are subject to forfeiture under Section 981. *See id.* ¶¶ 133–42.

c.  Purchase of the remaining Defendant Properties

The Fisher Claimants list several other properties and allege that for each "there is no explanation or proof provided as to the specifics" any unlawful activity. *See* Fisher Mot. at 7. The following vehicles are accounted for in my analysis *supra* Part IV(B)(2)(b): Defendant 2017 Ford F-250, Defendant 2019 Ford F-550, Defendant Holland E30C Mini Excavator, Defendant 2023 Kubota MX6000 Tractor, and Defendant 2023 Chevrolet Dump Truck.

The remaining vehicles were all purchased in 2023 and the Government has sufficiently traced those purchases to funds that the Government alleges were unlawfully taken from L.J.'s Accounts upon his death: Defendant 2023 Polaris Ranger Crew, Defendant 2023 Can-Am Maverick, Defendant 2014 Caterpillar D5K2 LGP Bulldozer, Defendant 2003 Harley Davidson Road King, Police Edition, Defendant 1938 Plymouth Deluxe 2 Door Coupe, Defendants 1967 Chevrolet Camaro, Defendant 1972 Chevrolet Cl0, Defendant 1967 Chevrolet El Camino, Defendant 1937 Chevrolet 2 Door Coupe, and Defendant 1946 Chevrolet 3100. *See* Compl. ¶¶ 146–71; *id*. at 5.

Given the detailed allegations in the Complaint, the Court is satisfied the Government has satisfied its burden under Supp. R. G(2)(f). Accordingly, the Court finds that the Fisher Claimants Motion is denied.

### C.  Outstanding Defendant Properties

Having dispensed with the Claimants' Motions, the Court now turns to the remaining Defendant Properties: a 2021 Audi A5, WIN: WAUTAAF55MA042207, Dkt. No. 26 at 3,[9] Jacqueline Fisher's 2018 Audi Q5, VIN WA1BNAFY6J2079610, Dkt. No. 23 at 3, and Ryan Passino's 2023 Polaris RZR Trail S Premium UTV, VIN: 3NSASE999PH426359, Dkt. No. 24 at 3. On the Court's review, these vehicles were not briefed as part of the Claimants' motions to dismiss yet appear as Defendant Properties in the instant action. *See supra* Part II(E). Thus, the Court considers these Properties subject to forfeiture under the Government's Complaint.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Griffith's motion to dismiss, Dkt. No. 32, is **DENIED**; and it is further

**ORDERED**, that the Fisher Claimants' motion to dismiss, Dkt. No. 29, is **DENIED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      September 30, 2025
            Albany, New York

LAWRENCE E. KAHN
United States District Judge

---

[9] Griffith originally claimed this vehicle but asserts she has since withdrawn the claim of ownership for Defendant Property 2021 Audi A5, VIN: WAUTAAF55MA052207 because this vehicle is now possessed by L.J.'s estate. *See* Griffith Mot. at 1 n.1.